IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) |
| SAMMY DALE BEITZEL, | )  Case No. 05-51078 |
| | ) |
| Debtor. | ) |
| | ) |

**MEMORANDUM OPINION**

On May 12, 2005, the United States Bankruptcy Administrator (the "Bankruptcy Administrator") filed a motion to dismiss the Chapter 7 bankruptcy case of Sammy Dale Beitzel (the "Debtor") for substantial abuse of the Bankruptcy Code under Section 707(b). The Court held a hearing on this matter on September 30, 2005. Robyn C. Whitman appeared on behalf of the Bankruptcy Administrator, and Richard Jackson appeared on behalf of the Debtor. After consideration of the motion to dismiss, the evidence presented at the hearing, the arguments of the parties, and the relevant law, the Court will deny the Bankruptcy Administrator's motion to dismiss the Debtor's case.

**I.   BACKGROUND**

On April 11, 2005, the Debtor filed his Chapter 7 bankruptcy petition. The Debtor listed primarily consumer debts on his schedules, mostly consisting of unsecured indebtedness of $177,153.70, two mortgages totaling $225,833.61, and two vehicle liens totaling $61,851.18. As of the date of the petition, the Debtor was employed as a salesman at Builders First Source, a supplier of construction materials, earning a net monthly income of $4,474.[1] The Debtor has two

---

[1] The Debtor nets $4,474 per month from his employer. The Debtor testified that he typically receives a tax refund of approximately $10,000.00 per year. Adding an estimated monthly amount from tax refunds, the Chapter 13 Trustee established the Debtor's actual monthly income to be

minor children, ages 14 and 16.

The Debtor's Schedule J showed monthly expenses of $5,023. After meeting with the Chapter 13 Trustee and reassessing his actual monthly expenses, the Chapter 13 Trustee determined that the Debtor's actual monthly expenses total $4,945.

The Debtor's bankruptcy was mainly the result of credit card debt that accumulated over the span of several years, with the Debtor paying one credit card bill with another credit card and attempting to make larger payments on the higher interest credit cards when the Debtor received extra income, such as his annual income tax refund. This cycle of debt spiraled out of control long before the Debtor filed his petition.

The Debtor attempted to manage his credit card debt in numerous ways outside of bankruptcy. The Debtor incurred a second mortgage on his home in June of 2001 in the amount of $62,000, the sum of which he used to pay credit card bills. The Debtor testified that he routinely used his annual tax refunds to pay on his credit cards.

The Debtor's spouse is not employed outside the home. The Debtor testified that she cares for her ill mother,[2] who resides with the Debtor's family, and she home schools their two teenage sons. The Debtor's spouse has a G.E.D. degree. The Debtor's spouse receives child support payments of $700 per month.

## II.   DISCUSSION

The Bankruptcy Administrator alleges that the Debtor is substantially abusing the Bankruptcy

---

$5,610.

[2]The Debtor testified that his mother-in-law has emphysema and suffers from seizures to the point that she cannot be left unattended.

Code on the basis that the filing of his petition is an attempt to take unfair advantage of his creditors. The primary grounds for the Bankruptcy Administrator's allegation are that the Debtor incurred debt beyond his ability to pay, and that the Debtor's unsecured creditors should not suffer because the Debtor insists on keeping a home that the Bankruptcy Administrator asserts is too expensive for him.

Section 707(b) of the Bankruptcy Code provides that the Court may dismiss a case filed by a Chapter 7 debtor whose debts are primarily consumer debts, if the Court finds that granting the debtor relief would be a substantial abuse of the Bankruptcy Code. 11 U.S.C. § 707(b). The burden of proving substantial abuse rests on the moving party. In re Vansickel, 309 B.R. 189, 213 (Bankr. E.D. Va. 2003). Moreover, there is a statutory presumption in favor of granting the relief requested by the debtor in determining whether to dismiss a case. 11 U.S.C. § 707(b). As the leading treatise on bankruptcy states:

> [T]he statutory presumption is obviously meant to be something more than simply a rule about the burden of proof, since that burden would already have been on the party seeking to dismiss the case. . . . It appears that the presumption is an indication that in deciding the issue, the court should give the benefit of any doubt to the debtor and dismiss a case only when a substantial abuse is clearly present.

6 Collier on Bankruptcy ¶ 707.04[5][a], p. 707-27 to 707-28 (Alan N. Resnick & Henry J. Sommer, eds., 15th rev. ed. Matthew Bender 2004). See also Harris v. United States Trustee (In re Harris), 279 B.R. 254, 259 (B.A.P. 9th Cir. 2002)(noting that the lack of clarity in the statute was akin to inspired tergiversation and concluding that the burden of proof necessary to overcome the presumption was not "clear abuse," but was one of "substantial abuse" as stated in the statute).

Abuse of the Bankruptcy Code occurs under Section 707(b) when a debtor attempts to use the provisions of the Code to get a "head start" rather than a "fresh start." Green v. Staples (In re Green), 934 F.2d 568, 570 (4th Cir. 1991)(providing that Section 707(b) allows "a bankruptcy court

to deal equitably with the situation in which an unscrupulous debtor seeks to gain the court's assistance in a scheme to take unfair advantage of his creditors."); In re Schmonsees, No. 01-10844, 2001 Bankr. LEXIS 1896 at *5 (Bankr. M.D.N.C. 2001)("Section 707(b) should be applied in a manner in which a truly needy debtor is allowed a fresh start, while denying a head start to the abusers."). In the Fourth Circuit, a "totality of the circumstances" test is used in making a determination of substantial abuse under Section 707(b) because it is consonant with Congressional intent to punish the abusers of the Bankruptcy Code and with the statutory presumption in favor of granting the relief requested by a debtor. Green, 934 F.2d at 573. Some of the relevant factors to be evaluated in the "totality of the circumstances" approach include:

> (1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;
> (2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;
> (3) Whether the debtor's proposed family budget is excessive or unreasonable;
> (4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and
> (5) Whether the petition was filed in good faith.

Id. at 572 (citations omitted). The Fourth Circuit also stated "that the majority of the cases hold that the debtor's ability to repay is the primary factor to be considered." Id.

### A. Ability to Repay Debts

The Court finds that the Debtor does not have an ability to repay a significant portion of his debt. An appropriate method of evaluating whether a debtor has the ability to repay debts is to determine what amount of that indebtedness could be repaid in a hypothetical Chapter 13 plan. See, e.g., Shaw, 310 B.R. at 541 ("In contrast with the second factor of the 'totality of the circumstances' test, where 'ability to repay' analyzes the debtor's historical ability to repay debts, 'ability to repay'

in this context analyzes the degree to which the debtor could pay creditors a significant portion of the debt under a Chapter 13 plan."). Although a number of courts have considered the percentage of total indebtedness that could be repaid through a hypothetical Chapter 13 plan, there is no bright line test. As stated by one bankruptcy judge:

> While it may be true that the higher the percentage of debt a Debtor could pay with future earnings, the more likely it is that a court would find substantial abuse, the converse is not true. Otherwise debtors would be rewarded for having more debt, rather than less. Instead of the percentage of debt, the determination of a debtor's ability to fund a Chapter 13 plan is based on a consideration of the debtor's ability to make a substantial effort in repaying his or her debts.

In re Praleikas, 248 B.R. 140, 145 (Bankr. W.D. Mo. 2000).

The Bankruptcy Administrator asserted that if the Debtor obtained more affordable housing, then the Debtor would be able to repay some of his debts. Pursuant to the calculations made by the Chapter 13 Trustee, the amount that the Debtor has each month to repay creditors ranges from $665 (which uses the actual $2,020 mortgage payment) to $1,185 (which uses a $1,500 mortgage payment).[3] In her calculations, the Chapter 13 Trustee properly did not include income of $700 per month that the Debtor's spouse receives as child support payments. The $665 of disposable income would pay nothing to unsecured creditors within 36 months; the $1,185 of disposable income would yield a 10% repayment to unsecured creditors.

## B. Reasonableness of Budget

Apart from the Debtor's housing expense, there is little dispute that the Debtor's Schedule J budget is reasonable. The Bankruptcy Administrator argues, however, that the housing payment alone renders his budget unreasonable and that given the Debtor's current income his home

---

[3] The amount of $1,500 is the amount that the Chapter 13 Trustee believes is appropriate for a family of five in this district.

5

is just too expensive.

A debtor's budget may be unreasonable or excessive based on a high mortgage payment. E.g., Shaw v. United States Bankr. Adm'r (In re Shaw), 310 B.R. 538, 541(M.D.N.C. 2004)(finding that the debtors earned $7,804.11 in net monthly income and that a mortgage payment of $3,349.00 on a $415,000.00 house was unreasonable in that it manifested a desire to hold on to a station in life that seemed to precipitate the bankruptcy in the first place); Schmonsees, 2001 Bankr. LEXIS 1896 at *12-13 (holding that mortgage payments of $2,450.00 on a $290,000 four-bedroom home in an upscale neighborhood occupied by two people was excessive when the debtor and his non-filing spouse earned a net pay of $5,400.00 per month); In re Engskow, 247 B.R. 314, 317 (Bankr. M.D. Fla. 2000)(stating that mortgage, taxes, and insurance expenses of $2,184.53 were excessive when the debtor's net income was $3,548.40 and when the debtor did not include the income of his spouse on the schedules); United States Trustee v. Duncan (In re Duncan), 201 B.R. 889, 896 (Bankr. W.D. Pa. 1996)(finding a mortgage and utility expenses consuming 89% of the household budget was unreasonable and unconscionable, considering the debtor was attempting to wipe out nearly $224,000.00 in unsecured indebtedness). Cf. Vansickel, 309 B.R. at 199-200 (finding that $2,300.00 per month in rent was not excessive for a family of four in a three bedroom townhouse when the debtor's net income was $5,287.00 per month); In re Hammed, No. 04-53282, 2005 Bankr. LEXIS 1096 at *18 (Bankr. M.D.N.C. April 22, 2005)(finding that a $1,740 mortgage payment for a family of five that constituted 31% of the budget was not unreasonable); In re Parker, 04-12747, 2005 Bankr. LEXIS 1086 at *19-20 (Bankr. M.D.N.C. Jan. 25, 2005)("Given the length of time that the Debtor has owned her home, the size of her family, the relative cost of alternative housing, and the relatively modest living conditions of the Debtors, the Court is convinced that the Debtor did not

inflate her homestead costs in an effort to live an indulgent and luxuriously lifestyle at the expense of her unsecured creditors.").

In considering whether a housing expense is excessive, due regard should be given to the size of the family, their reasonable needs, and the cost of alternative housing. Furthermore, a court should not unduly depreciate a debtor's long-standing, traditional ties to a homestead. See, e.g., 11 U.S.C. § 524(d)(2)(providing that a court is not required to ascertain whether a reaffirmation of a consumer debt secured by the debtor's real property would result in an undue hardship on a debtor or whether it would be in the debtor's best interest).

In this case, the Debtor purchased his home in 2001 for $185,000. The home has three bedrooms, measures 2,000 square feet, and is situated on one acre of land. The Debtor resides in the home with his wife, his two teenage stepsons, and his wife's ill, elderly mother. The Debtor incurred a second mortgage in late 2001 in the amount of $62,000, the result of which was that the Debtors financed 125% of the value of the home. Currently, the house has a value of $200,000, and the two mortgages total $225,833.61. The Debtor's total mortgage payment is $2,020 per month, which is 36% of the Debtor's total household income.[4] There is no equity in the property.

The Court finds that the Debtor's housing expense is reasonable. The Debtor only uses 36% of his monthly income to pay the mortgages.[5] A 2,000 square foot house is not large for a family of five. It is unlikely that the Debtor would be able to find suitable housing for his family that would cost significantly less than his current home. Moreover, the Debtor and his family have lived in the

---

[4]The Chapter 13 Trustee determined the Debtor's monthly income to be $5,610.

[5]Taking into account the $700 per month of child support received by the Debtor's wife, the percentage is only 32%.

house for over four years, and the disruption caused by moving would constitute an undue hardship on them.

### C. Illness, Calamity, Disability, or Unemployment

While the Debtor's bankruptcy filing was not due to <u>sudden</u> illness, calamity, disability, or unemployment, serious medical issues exist that contributed to the Debtor's decision to file bankruptcy. The Debtor's mother-in-law suffers from chronic lung disease and emphysema. Further, the Debtor testified that his mother-in-law must have constant care because she has seizures and cannot be left alone. The Debtor's mother-in-law moved in with the Debtor's family when she became ill, and the Debtor's wife cares for her.

The Debtor's father and mother also have serious medical problems. They were living with the Debtor in his home until recently and will likely return to living with the Debtor in the near future.[6] The Debtor's father is seventy-six years old. He has bladder cancer and recently had his bladder removed. The Debtor's mother is seventy-three years old. She recently had surgery for poor circulation and will likely have her leg removed soon. The Debtor's parents live on social security payments and are self-supporting at this time. However, if their health worsens, the Debtor is the only family member who is able to care for them, which makes his future financial situation unpredictable at best.[7]

### D. Cash Advances and Consumer Purchases in Excess of Ability to Repay

The Bankruptcy Administrator contends that the Debtor incurred approximately $177,154.00 in unsecured debt when the Debtor did not have any reasonable expectation that he would be able

---

[6] Letter from Kathryn L. Bringle, Chapter 13 Trustee, June 27, 2005.

[7] Letter from Kathryn L. Bringle, Chapter 13 Trustee, June 27, 2005.

to repay it.

Incurring indebtedness without any reasonable expectation of being able to repay it is a factor for a court to consider when determining if a debtor is attempting to substantially abuse the Bankruptcy Code, but a court should not so broadly interpret this factor to foreclose the availability of Chapter 7 relief to nearly all consumer debtors; rather, a debtor's ability to repay consumer purchases and cash advances should be interpreted in a manner consistent with the Debtor's reasonable expectations of repayment at the time that the debt was incurred.  Vansickel, 309 B.R. at 211.  Indeed, nearly all debtors in bankruptcy have incurred obligations in excess of their ability to repay, and the bankruptcy court is mandated to adhere to the statutory presumption that a debtor is entitled to the relief originally sought.  11 U.S.C. § 707(b).  Taken in its proper context, a court should examine the nature of the debts incurred, if the debts were consistent with the debtor's financial status, and whether there was an unexplained change in spending patterns – all of which must be considered in light of whether a debtor is taking unfair advantage of creditors.  Vansickel, 309 B.R. at 211.

The Debtor's total unsecured debt in this case is $177,154.00.  He has secured indebtedness on his house and vehicles of $287,684.61.  In light of the total income of the Debtor over the past few years, this amount may appear excessive.  The Debtor expects to earn $80,000.00 in income for 2005, which is approximately the same as his annual income for 2004.  However, the majority of the Debtor's credit card purchases are old debts from several years ago (dating back to 1991), not recently incurred debt, and they were not incurred for purchases of luxury goods.  Further, the Debtor encumbered his home with a second mortgage to pay down his credit card debt.  During the last several years, the Debtor has struggled to manage and pay his credit card debts by making continued

monthly payments on the credit cards and applying any unexpected or extra funds received toward payment on credit cards. The credit card debt grew beyond the Debtor's means to repay it over a period of several years. Accordingly, the Debtor's inability to pay for his consumer purchases do not appear to be flagrant, and in fact, the Debtor attempted to pay his credit card debts using any and all means available to him, including incurring a second mortgage on his home and using his annual tax refunds to pay on credit cards. The Debtor testified that he was never late on a credit card payment or any other payment until October of 2003. At that time, the Debtor fell behind in his credit card payments, and the credit card companies increased his interest rates and fees on his cards, which caused the Debtor to become further behind in his credit card obligations. The Debtor harbored a reasonable expectation that he would be able to repay his debts as he had been doing during previous years.[8] The evidence presented on this issue was inconclusive at best and did not meet the required burden of proof to establish that the Debtor incurred debts beyond his ability to repay.

### E.   Accuracy of the Debtors' Schedules

The Bankruptcy Administrator cites several inconsistencies in the Debtor's schedules as evidence of the Debtor's abuse in filing his chapter 7 bankruptcy. Taken as a whole, the Bankruptcy Administrator contends that the Debtor's errors and omissions weigh in favor of dismissing the Debtor's case for substantial abuse.

The importance of having a debtor submit complete and accurate bankruptcy schedules is paramount; the bankruptcy system relies heavily on self-reporting by debtors. Mertz v. Rott (In re Mertz), 955 F.2d 596, 598 (8th Cir. 1992)("[T]he petition, including schedules and statements, must

---

[8]The Debtor testified that he no longer makes any purchases with credit cards.

be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts."); In re Fauntleroy, 311 B.R. 730, 738 (Bankr. E.D.N.C. 2004) (emphasizing that the schedules and statement of current income and expenses are to reasonably and accurately reflect the debtor's true financial condition). "Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987). Innocent mistakes in the form of a few minor omissions or errors might be forgiven; but multiple inaccuracies evidence "'a pattern of reckless and cavalier disregard for the truth'" and can lead to a finding that a bankruptcy petition was filed with fraudulent intent. Dean v. McDow (In re Dean), 299 B.R. 133, 140 (E.D. Va. 2003)(Section 727(d)(1) revocation of discharge proceeding)(citation omitted). Any amendment that a debtor makes to Schedules I and J subsequent to a motion to dismiss under 11 U.S.C. § 707(b) is viewed with inherent suspicion. In re Gullett, No. 03-10995, 2004 Bankr. LEXIS 1696 at *11 (Bankr. E.D. Ky. 2004); In re Lee, 162 B.R. 31, 43 (Bankr. N.D. Ga. 1993).

  The Debtor has certain inaccuracies on his schedules. The Debtor failed to list dining room furniture on Schedule B that he claimed as exempt on Schedule C. The Debtor testified the dining room furniture had a value of $300 to $400. However, the Debtor's Schedule B lists "miscellaneous household furnishings" totaling $1,000. The dining room furniture may have been included in that category. Second, the Debtor testified that he owns three television sets, which the Bankruptcy Administrator claimed were not listed on his Schedule B. Again, the "miscellaneous household furnishings" could include the three televisions. Further, the Debtor testified that the televisions were all purchased prior to 2001 and were of little value. The Debtor has two computers, one for his work and one for family use, which were not listed in the Debtor's schedules. The Debtor

testified that his work computer is two years old and the family computer is four years old. Finally, the Debtor owns a John Deere riding lawnmower that was not listed on his Schedule B. The Debtor testified that the lawn mower is three years old.

These errors in the Debtor's schedules are not serious enough to affect a determination of substantial abuse of the Bankruptcy Code.

### F. Good Faith

The Bankruptcy Administrator argues that the Debtors did not file their bankruptcy in good faith mainly because the Debtor continue to live in a house with a $2,020 monthly mortgage payment while his unsecured creditors receive little, if anything.

An analysis of whether a petition was filed in good faith – for purposes of an 11 U.S.C. § 707(b) motion – concerns whether a debtor is misusing the bankruptcy process to achieve some illicit purpose. Kestell v. Kestell (In re Kestell), 99 F.3d 146, 149-50 (4th Cir. 1996)(finding a "substantial abuse of the Bankruptcy Code when the debtor filed solely to discharge obligations owed to his former spouse – not any other creditor – because favoritism among creditors is antithetical to the bankruptcy process and the Bankruptcy Code is not to be used as a method of advancing personal antagonisms against an ex-spouse). "Good faith" is defined as "a state of mind consisting in (1) honesty in belief or purpose, . . . or (4) absence of intent to defraud or seek unconscionable advantage." Black's Law Dictionary 713 (8th ed. 2004). See also Stewart v. United States Trustee (In re Stewart), 175 F.3d 796, 810 (10th Cir. 1999)(finding that a physician's opting for a lower paying job, disregarding his family support obligations, and buying a $26,000 vehicle instead of paying for those expenses – among other things – was sufficiently analogous to the old adage of "having your cake and eating it too" so as to call into question the debtor's good faith); In

re Dominguez, 166 B.R. 66, 69 (Bankr. E.D.N.C. 1994)("Presumably, "good faith" [within the meaning of Section 707(b)] means subjective good faith.").

The Bankruptcy Administrator has failed to demonstrate any bad faith on the part of the Debtor. The Bankruptcy Administrator has shown no practice of running up insurmountable debts in contemplation of bankruptcy, no dishonesty toward or intent to defraud creditors, or any other unconscionable advantage that the Debtor seeks to gain through his bankruptcy. As discussed above, the Court does not consider the Debtor's housing costs excessive based on the circumstances of this case, and the mere fact that unsecured creditors are left unpaid after a bankruptcy filing is an insufficient basis for finding a lack of good faith. More succinctly, the Debtor is an honest debtor in need of a "fresh start."

## Conclusion

Having found that the Debtor's housing expense in this case is reasonable, and considering that even with the Debtor's highest estimated monthly budget surplus he would pay only 10% to unsecured creditors in a Chapter 13 case, the Court does not believe that the Debtor has the ability to make a substantial effort to repay his debts. Further, the Court is satisfied that the Debtor filed his petition in good faith, that serious medical issues exist that contributed to the filing of the bankruptcy, that the inaccuracies in the Debtor's schedules are not significant, and that the Debtor intended to repay his debts when he incurred them. After weighing the totality of the circumstances surrounding the Debtors' bankruptcy filing and determining that the Debtor does not have an ability to repay a meaningful amount of his debt, the Court finds that the Debtor's case does not constitute a "substantial abuse" of the Bankruptcy Code within the meaning of 11 U.S.C. § 707(b).

This opinion constitutes the Court's findings of fact and conclusions of law. A separate order

13

shall be entered pursuant to Fed. R. Bankr. P. 9021.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| SAMMY DALE BEITZEL, ) | Case No. 05-51078 |
| ) | |
| Debtor. ) | |
| _____) | |

PARTIES IN INTEREST

Stafford R. Peebles, Jr., Esquire

Robyn C. Whitman, Esquire

Sammy Dale Beitzel